Ernest KUNNANZ and Alouise Kunnanz, Plaintiffs and Appellants,

v.

Stephen Leon EDGE, Defendant and Appellee.

Civ. No. 930198.

Supreme Court of North Dakota.

April 20, 1994.

Roger R. Sundling (argued) and Alice R. Senechal (argued), Robert Vogel Law Office, PC, Grand Forks, for plaintiffs and appellants.

Donald L. Peterson, McGee, Hankla, Backes & Wheeler, Ltd., Minot, for defendant and appellee. Submitted on brief.

MESCHKE, Justice.

Ernest and Alouise Kunnanz [Kunnanzes] appeal from a judgment, entered upon a jury verdict, dismissing their medical malpractice action against Dr. Stephen Edge. We reverse and remand.

On November 5, 1987, Ernest sought emergency room treatment for what was diagnosed as a kidney stone in his upper ureter. Ernest's physician, Dr. Charles Swensen, sent him to Dr. Edge, a specialist in urology. Dr. Edge recommended an ureteroscopy, a procedure that inserts an ureteroscope, an instrument resembling a small telescope, through the urethra and bladder into the ureter to remove the kidney stone.

According to Dr. Edge, he informed the Kunnanzes about the risks from an ureteroscopy and about alternative treatments. Dr. Edge performed the ureteroscopy on Ernest the same day, and during the procedure, the stone was pushed from Ernest's upper ureter into his kidney and was not removed. Dr. Edge's "report of operation" stated Ernest's ureter was "very narrow ..., [t]here was need to dilate the ureter every 4 or 5 cm.", and "[t]he ureteroscope was then adequately passed up to the level of the renal pelvis; however, no attempt was made at inspecting the renal calices because of the difficulty in passing the ureteroscope due to the size of the ureter." After the operation, Dr. Edge inserted a ureteral stent into Ernest's ureter to allow urine to flow from the kidney to the bladder while irritations to the lining of the ureter healed.

Dr. Edge removed the stent two weeks later and treated Ernest through December 16, 1987, when an x-ray revealed a partial obstruction near the top of Ernest's ureter. Ernest then asked Dr. Swensen to refer him to another doctor for a second opinion, and he was sent to Dr. John Hulbert, an urologist at the University of Minnesota Hospital. On December 22, 1987, Dr. Hulbert performed another ureteroscopy on Ernest. Tests after the second ureteroscopy showed two perforations and a submucosal tunnel in Ernest's upper ureter. Further examination by another urologist determined that Ernest's upper ureter had been damaged, and in March 1988, his ureter and kidney were removed.

Kunnanzes separately sued Dr. Edge in North Dakota and Dr. Hulbert in Minnesota, alleging negligence in the ureteroscopy performed by each. Kunnanzes alleged that Dr. Edge negligently performed the first ureteroscopy and failed to provide them informed consent about alternative treatments for kidney stones, including a non-invasive shockwave procedure called extracorporeal shock wave lithotripsy (ESWL). They asserted Dr. Edge pushed the kidney stone from Ernest's upper ureter into his kidney where it could not be removed without damaging the ureter and kidney. They contended that accepted standards of medical care required Dr. Edge to end the ureteroscopy then but, instead of stopping the procedure, Dr. Edge continued attempts to remove the stone, causing damage to Ernest's upper ureter and kidney. Dr. Edge responded that he was not negligent and contended that Ernest's injuries happened at the University of Minnesota Hospital.

After a Minnesota jury found in favor of Dr. Hulbert in Kunnanzes' action against him, a North Dakota jury found in favor of Dr. Edge in this action. Kunnanzes appealed from the judgment exonerating Dr. Edge.

## 1. Minnesota Lawsuit

■ Kunnanzes contend that the trial court erred in excluding evidence that a jury found in favor of Dr. Hulbert in their Minnesota lawsuit. We agree.

The trial court allowed Dr. Edge to introduce Kunnanzes' summons and complaint in their Minnesota action, but refused to allow Kunnanzes to introduce evidence of the defense verdict in that lawsuit and, instead, instructed the jury:

### OTHER LITIGATION

Evidence has been introduced in this case of previous litigation between the Plaintiffs Ernest and Alouise Kunnanz against John C. Hulbert, David Hunter, and the Re-

gents of the University of Minnesota. This litigation was brought in the District Court in Hennepin County, Minnesota.

> You are instructed and admonished to give no consideration or speculation as to the outcome or disposition of this litigation.

After the court decided to give this cautionary instruction, the court refused Kunnanzes' requested instruction that "[t]he law does not allow Mr. and Mrs. Kunnanz to receive double recovery and they are not seeking double recovery in this lawsuit." Kunnanzes argue that the exclusion of the result in their Minnesota lawsuit allowed the jury to believe that the injuries happened at the University of Minnesota Hospital and that Kunnanzes · were seeking double recovery here.

◼ Subject to relevancy, a party's factual statements in another pleading are generally received as an evidentiary admission by that party. *Vincent v. Louis Marx & Co., Inc.,* 874 F.2d 36 (1st Cir.1989); *Enquip, Inc. v. Smith–McDonald Corporation,* 655 F.2d 115 (7th Cir.1981); *Continental Insurance Co. of New York v. Sherman,* 439 F.2d 1294 (5th Cir.1971). *See* 2 McCormick, Evidence ¶ 257 (4th ed. 1992); 4 Weinstein's Evidence ¶ 801(d)(2)(A)[01] (1993); 4 Louisell & Mueller, Federal Evidence, § 425 (1980); 29 Am. Jur.2d, Evidence §§ 687, 695 (1967). However, the party against whom the pleading is used must be allowed to explain the admission. *Vincent; Enquip; see* 30 Am.Jur.2d, Evidence § 1099 (1967). That requirement corresponds to the rule of completeness in N.D.R.Ev. 106, directing that "[w]henever a writing ... is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it." The rule of completeness is a rule of "fairness" (N.D.R.Ev. 106, explanatory note) that applies to the introduction of writings such as admissions in prior pleadings. 29 Am.Jur.2d, Evidence § 689. In this case, the Kunnanzes were not afforded a fair opportunity to provide a full and complete explanation of their prior pleading.

Courts have recognized an exception to the general rule of evidentiary use of prior pleadings as admissions where claims are pleaded alternatively in multiple-party litigation. *Garman v. Griffin,* 666 F.2d 1156 (8th Cir. 1981); *Continental; see Enquip. See generally* 29 Am.Jur.2d, Evidence § 692. In *Continental,* 439 F.2d at 1298, the court explained:

> Strictly applied, however, this rule [of admissibility of prior pleadings] would place a litigant at his peril in exercising the liberal pleading and joinder provisions of the Federal Rules of Procedure in that inconsistent pleadings under Rule 8(e)(2) could be used, in the proper circumstances, as admissions negating each other and the allegations in third-party complaints and cross-claims seeking recovery over in the event of liability in the principal action could be used in that action as admissions establishing liability. Thus, as a necessary exception to the general rule, there is ample authority that one of two inconsistent pleas cannot be used as evidence in the trial of the other.

Although Kunnanzes separately sued Dr. Edge and Dr. Hulbert in different jurisdictions, the procedural posture of these two lawsuits is essentially like alternative and inconsistent pleading. On retrial, the trial court is free to consider excluding the Minnesota pleadings, if otherwise practical, in lieu of extending the trial by their use and explanations.

The evidence demonstrates that Ernest's injuries arose after he received medical care. Dr. Edge's own expert, Dr. Irving Thorne, testified that the damage to Ernest's ureter was caused by a doctor. Kunnanzes' position in this lawsuit was that Ernest's injuries were caused by Dr. Edge, or by both Dr. Edge and Dr. Hulbert. Dr. Edge repeatedly asserted that Ernest's injuries occurred at the University of Minnesota Hospital. Once Kunnanzes' pleadings from their Minnesota lawsuit were introduced into evidence in this case, basic fairness entitled them to an opportunity to provide a complete explanation of those pleadings to avoid misleading the jury about the effect of the prior litigation.

Rules of evidence "shall be construed to secure fairness in administration ... to the end that the truth may be ascertained and

proceedings justly determined." N.D.R.Ev. 102. Although the trial court gave a cautionary instruction about the other lawsuit, the posturing of this case without letting the jury know about the outcome of the Minnesota claim presented an incomplete picture of that action and resulted in an unfair advantage to Dr. Edge. *See Slaubaugh v. Slaubaugh,* 466 N.W.2d 573 (N.D.1991) (unfair posturing of case required retrial). We believe the trial court's refusal to allow Kunnanzes to introduce evidence of the result in the Minnesota lawsuit deprived them of a fair opportunity to fully explain their prior pleading.

■ We hold that the trial court's refusal to allow Kunnanzes to introduce evidence of the outcome in the Minnesota lawsuit was reversible error. We reverse and remand for a new trial.

Kunnanzes raise additional questions about admission of evidence and jury instructions, and we consider those that are likely to arise on retrial. *See Oanes v. Westgo, Inc.,* 476 N.W.2d 248 (N.D.1991). Next, we examine other evidentiary rulings that Kunnanzes complain about.

### 2. Evidentiary Rulings

#### A. Kunkel Lawsuit

■ Kunnanzes assert that the trial court erred in refusing to allow them to introduce evidence of similar medical care by Dr. Edge to another patient. According to Kunnanzes, one week before Ernest's operation, Dr. Edge performed an ureteroscopy on Cathy Kunkel and perforated her ureter, leading to a kidney loss. Kunkel sued Dr. Edge, and her case was settled prior to the trial of this action. Kunnanzes argue that Kunkel's testimony showed Dr. Edge's ureteroscopy complication rate and was highly probative of his skill and competence. Dr. Edge answers that he did not perforate Kunkel's ureter and that his treatment of her was not probative of the degree of his care in this case. He argues that, under N.D.R.Ev. 403, the trial court properly excluded Kunkel's testimony.

■ N.D.R.Ev. 403 grants a trial court discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Ebach v. Ralston,* 510 N.W.2d 604 (N.D. 1994); *Williston Farm Equipment, Inc. v. Steiger Tractor, Inc.,* 504 N.W.2d 545 (N.D. 1993). We review a trial court's balancing of the probative value of proffered evidence against the dangers enumerated in N.D.R.Ev. 403 under an abuse-of-discretion standard. *Ebach; Williston Farm Equipment.* As we explained in *Wall v. Pennsylvania Life Ins. Co.,* 274 N.W.2d 208 (N.D. 1979), a trial court abuses its discretion if it acts arbitrarily, capriciously, or unreasonably.

Negligence generally cannot be proved by showing the commission of similar prior acts by the same person. N.D.R.Ev. 404(b); *Lange v. Cusey,* 379 N.W.2d 775 (N.D.1985). *See* 1 McCormick, Evidence ¶ 189 (4th ed. 1992); 29 Am.Jur.2d, Evidence § 315. The purpose of Kunnanzes' proffered evidence was to show that Dr. Edge was negligent in treating Kunkel. However, that evidence was not admissible to show that Dr. Edge was negligent in treating Ernest, and its introduction would have injected a collateral matter into this trial and confused the jury. The trial court's exclusion of that evidence was not arbitrary, capricious, or unreasonable.

■ Kunnanzes argue that the trial court erred in refusing to allow them to use Dr. Edge's deposition in the Kunkel action to impeach his testimony in this action. Kunnanzes offered to prove:

Plaintiffs would offer the following evidence of Dr. Edge's skill at ureteroscopy.

One week prior to the procedure performed on Mr. Kunnanz, Dr. Edge did a ureteroscopy on another patient. He perforated that other patient's upper ureter, but recognized the perforation and stented the ureter for one week. The ureter did not heal, and the patient lost her kidney because of the ureteral injury.

Dr. Edge has presented evidence of his experience and has testified that he is an expert at ureteroscopy. Evidence of the number of ureters he had injured prior to

Mr. Kunnanz's procedure is highly probative of Dr. Edge's skill at ureteroscopy. Its probative value outweighs its prejudice. Dr. Edge testified on direct that it was his usual practice to leave a stent in place for two weeks after ureteroscopy. On cross, he testified that he did not recall having left a stent in for one week after having perforated a ureter during ureteroscopy. Plaintiffs seek to use Dr. Edge's deposition in *Kunkel v. Edge* to impeach that evidence.

Without introducing evidence of the other lawsuit, Plaintiffs seek to ask Dr. Edge the number of ureters he has perforated during ureteroscopy, and the number of those patients who have lost their kidneys following ureteroscopy.

Kunnanzes argue that the court's refusal to allow use of Dr. Edge's deposition from the Kunkel lawsuit denied them an adequate opportunity to cross-examine and impeach Dr. Edge about his complication rate and about the differences and similarities in his treatments of Ernest and Kunkel. They assert that, in addition to being substantially prejudiced by the limitation on impeachment of Dr. Edge, the court's ruling prevented the jury from hearing how Dr. Edge treated a known perforation, his knowledge of ESWL, and his procedure for obtaining informed consent.

N.D.R.Civ.P. 32(a)(1) regulates the use of depositions at trial:

At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the North Dakota Rules of Evidence.

Under that rule any deposition may be used to impeach the testimony of the deponent as a witness. *See Beck v. Lind,* 235 N.W.2d 239 (N.D.1975); *Klein v. Harper,* 186 N.W.2d 426 (N.D.1971). *See also* N.D.R.Ev. 801(d)(2) (admission by party-opponent). To the extent relevant, Dr. Edge's deposition from the Kunkel lawsuit would ordinarily be admissible to impeach his trial testimony in this case.

The trial court followed its earlier ruling about Kunkel's testimony under N.D.R.Ev. 403 and excluded the use of Dr. Edge's deposition testimony. Although Kunnanzes claim that Dr. Edge's deposition was clearly offered for impeachment purposes, the gist of their offer of proof was to show "Dr. Edge's skill at ureteroscopy," a purpose that essentially sought to prove Dr. Edge was negligent in his prior treatment of Kunkel. That evidence was not admissible for that purpose, and would have injected a collateral claim into this case. We cannot say the trial court acted arbitrarily, capriciously, or unreasonably in refusing to allow Kunnanzes to use Dr. Edge's deposition testimony from the Kunkel case for the purpose stated.

### B. Dr. Kroeger's Deposition

■ Kunnanzes argue that the trial court erred in not admitting significant portions of medical opinions from an audio-visual deposition of their expert, Dr. Robert Kroeger, because he was not asked whether those particular opinions were held to a reasonable degree of medical certainty.

To support a finding of medical negligence, we have required expert medical opinions to be expressed in terms of reasonable medical certainty or probability, not mere possibility. *Smith v. American Family Mutual Ins. Co.,* 294 N.W.2d 751 (N.D.1980); *VanVleet v. Pfeifle,* 289 N.W.2d 781 (N.D.1980); *Vaux v. Hamilton,* 103 N.W.2d 291 (N.D.1960). *See also Syverson v. North Dakota Workmen's Comp. Bureau,* 406 N.W.2d 688, 691 (N.D. 1987) (in order to justify workers compensation award, medical evidence need not "hundred percent affirm" a causal relationship between arthritic condition and employment). Our decisions have employed the magic words of "reasonable medical certainty," but have also recognized that a medical opinion

expressed in terms of reasonable probability suffices.

■ Other courts have held that the evidentiary standard for admission of an expert medical opinion does not require the mechanical recitation of "reasonable medical certainty" and is satisfied if the expert expresses a medical opinion that is more probable, or more likely than not. *Schulz v. Celotex Corp.*, 942 F.2d 204, 208 (3rd Cir.1991) ("Care must be taken ... to see that the incantation does not become a semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself."); *Dallas v. Burlington Northern*, 212 Mont. 514, 689 P.2d 273, 277 (1984) ("Our evidentiary standards are satisfied if medical testimony is based upon an opinion that it is 'more likely than not.'"); *Nunez v. Wilson*, 211 Kan. 443, 507 P.2d 329, 332 (1973) ("[E]vidence of probative value should not be excluded from the jury's consideration merely because a medical expert cannot state a fact with absolute certainty."); *Shahan v. Hilker*, 241 Neb. 482, 488 N.W.2d 577, 580 (1992) ("A medical expert's testimony need not be couched in the magic words ' "reasonable degree of medical certainty or a reasonable probability." ' "); *Stormo v. Strong*, 469 N.W.2d 816, 824 (S.D.1991) ("[T]he test is only whether the expert's words demonstrate that he or she was expressing an expert medical opinion."); *Drexler v. All American Life & Cas. Co.*, 72 Wis.2d 420, 241 N.W.2d 401, 408 (1976) ("No particular words of art are necessary...."). *See* Hullverson, Reasonable Degree of Medical Certainty: A Tort Et A Travers, 31 St. Louis U.L.J. 577 (1987). Hypertechnical words are not necessary for the admission of an expert medical opinion; the test for admissibility is whether the expert's testimony demonstrates the expert is expressing a medical opinion that is more probable, or more likely than not.

In this case, the trial court excluded the following deposition testimony of Dr. Kroeger:

Q. [Sundling] What should Dr. Edge have done once the stone was pushed into the lower pole calyx?

MR. PETERSON: I'm going to object as to foundation.

A. In my opinion once you have determined that the stone is no longer in a position where you have a reasonable chance of getting it out with the ureteroscope, the prudent thing to do would be quit the ureteroscopy, and in this case probably just put up a stent and discuss options later on.

Q. In response to the objection, is that what accepted standards required?

A. In my opinion, yes.

　　*　　*　　*　　*　　*　　*

Q. [Sundling] With the equipment that Dr. Edge was using could he have removed the stone from the lower pole calyx?

MR. PETERSON: I'm going to object as that assumes facts not in evidence. We don't know what equipment you are referring to, Mr. Sundling. Secondly, it calls for speculation on the part of the doctor without further foundation.

Q. (By Mr. Sundling) Let me see if I can fix the question. Doctor, using the equipment and particularly the ureteroscope that Dr. Edge was using at the time, was it technically possible to remove the stone from the lower pole calyx, and perhaps you can use a diagram?

A. Right.

MR. PETERSON: Before the doctor answers I also want to interpose the objection that there is no testimony that he was going to ever attempt to remove the stone from the lower calyx. That's assuming something not in evidence, as well.

THE WITNESS: Okay. If the stone is in the lower calyx and we were working with the rigid ureteroscope, you can see that the scope goes up here, you have a chance of getting a stone out of the renal pelvis and into the upper pole. Because this particular scope cannot bend, your chances of actually going down and getting a stone in that lower calyx are virtually zero. Now, you know you could get lucky, you could irrigate and maybe the stone would float by you and you would be able to grab

it. But it would not be a very high percentage proposition at all.

Kunnanzes argue that the exclusion of this evidence prevented the jury from hearing that Dr. Edge violated accepted standards of care by continuing the ureteroscopy after the stone was pushed into the kidney.

Dr. Kroeger's deposition testimony, as a whole, indicates he was expressing a medical opinion that was more probable, or more likely than not. Although the court excluded the above-quoted part of Dr. Kroeger's deposition testimony on a hypertechnical basis, the jury nevertheless heard the following testimony from Dr. Kroeger's deposition:

Q. [Sundling] How long did he continue to try and remove the stone?

A. I believe it was in the range of three and a half to four hours.

Q. In your opinion was this below accepted standard of care to continue attempting to remove the stone once it had been pushed back into the lower pole calyx?

A. Yes.

\* \* \* \* \* \*

Q. [Cross-examination by Peterson] Now, do you have any criticism of Dr. Edge's use of the—dilating the ureter as he is proceeding up with the scope?

A. Yes, really, I think that is, in my experience that is seldom necessary. Now, certainly there may be, you know, one point in the ureter that you run into where you want to do that dilatation. But I think at that point what the reality of the situation is that you have got a ureter that you probably can't get your scope up and it's probably not prudent to proceed under those circumstances. And you always have the option of terminating the procedure, leaving up the stent, and coming back another day or considering an alternative form of treatment.

Dr. Edge's expert witness, Dr. Irving Thorne, also testified on cross-examination:

Q [Sundling] Now, Doctor, do you agree that if a kidney stone has been pushed back into the kidney to the point where it cannot be reached with a rigid ureteroscope, there is no reason to continue the ureteroscopy?

A That's right.

Q And as a matter of fact at that point it is below accepted standards of care to continue with the ureteroscopy?

A If the stone was in an area where it could not be reached with the rigid ureteroscope?

Q Yes.

A That's right.

Thus, the jury did hear expert testimony to support Kunnanzes' contention that Dr. Edge violated accepted standards of medical care by continuing the ureteroscopy after the kidney stone was pushed into Ernest's kidney. Since the excluded testimony was cumulative, the trial court's rigid ruling about reasonable medical certainty would not require a retrial.

■ Kunnanzes assert that the trial court erred in excluding the following question on proximate cause during Dr. Kroeger's deposition testimony:

Q. [Sundling] And, Doctor, did Dr. Edge's failure to follow accepted standards proximately cause the loss of Mr. Kunnanz' kidney?

MR. PETERSON: I'm going to object as to that, that is a matter of factual question for the jury to determine and the issues of proximate causation are again matters of law and questions for the jury to decide in this case. This is not something that a medical physician is entitled to testify.

Although the trial court excluded that question because there was no "showing the witness knows what proximate means in a legal sense, rather than special sense," the court did not exclude Dr. Kroeger's answer immediately after that question:

Q. (By Mr. Sundling) Doctor, do you have an opinion on that question?

MR. PETERSON: Go ahead.

A. Well, I certainly think that there was damage done to the ureter as a result of that procedure that set up a chain of events that led to the ultimate loss of the kidney, yes.

N.D.R.Ev. 704 directs that opinion testimony is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. *See First Trust Co. of North Dakota v. Scheels Hardware,* 429 N.W.2d 5 (N.D.1988). However, we do not believe Kunnanzes were prejudiced by the trial court's exclusion of one question about proximate cause, because immediately after that question, Dr. Kroeger answered in proximate cause language that the "damage done to the ureter as a result of that procedure [by Dr. Edge] set up the chain of events that led to the ultimate loss of the kidney." [1]

 Kunnanzes assert that the trial court improperly excluded significant portions of Dr. Kroeger's opinion about the degree of care received by Ernest at the University of Minnesota Hospital, because their answers to interrogatories did not state that Dr. Kroeger would render an expert opinion on that issue. A trial court is vested with discretion to exclude expert testimony that is outside the scope of answers to interrogatories. *Schwartz v. Ghaly,* 318 N.W.2d 294 (N.D.1982). We review a trial court's ruling on that issue under an abuse-of-discretion standard. *Id.* We cannot say the trial court acted arbitrarily, capriciously, or unreasonably in excluding this item of Dr. Kroeger's testimony.

### C. Dr. Thorne's Testimony

 Kunnanzes assert that the trial court erred in refusing to exclude testimony of Dr. Edge's expert, Dr. Thorne, that related to the care provided Ernest at the University of Minnesota Hospital and that was not disclosed in Dr. Edge's interrogatory answers. The trial court allowed Dr. Thorne to testify that a complication arose during the course of Ernest's treatment at the University of Minnesota. Unlike Dr. Kroeger, Dr. Thorne did not attempt to offer an expert opinion about the standard of care received by Er-

nest at the University of Minnesota. The trial court did not abuse its discretion in refusing to exclude Dr. Thorne's testimony.

### D. Dr. Hulbert's Minnesota Testimony

 Kunnanzes assert that the trial court erred in excluding sworn trial and deposition testimony of Dr. Hulbert in the Minnesota lawsuit to impeach hearsay statements by Dr. Hulbert in Ernest's medical records from the University of Minnesota Hospital. Kunnanzes did not call Dr. Hulbert to testify in this case, but attempted to introduce his trial and deposition testimony from the Minnesota lawsuit. They indicated their purpose was to impeach hearsay statements in a diagram showing damage to Ernest's ureter at the University of Minnesota. However, Kunnanzes do not dispute that the diagram was not prepared by Dr. Hulbert and that Ernest's other medical records from the University of Minnesota were introduced by them. Dr. Edge did not participate in the Minnesota trial, and the record in this court does not explicitly detail the exact nature of the proffered evidence. *See* N.D.R.Ev. 103(a)(2). In this context, we cannot say that the trial court abused its discretion in excluding Dr. Hulbert's trial and deposition testimony from the Minnesota lawsuit.

### 3. Jury Instructions

 Jury instructions must fairly and adequately inform the jury of the applicable law. *Ebach v. Ralston,* 510 N.W.2d 604 (N.D.1994). Although Kunnanzes were entitled to instructions on their theory of the case, the trial court was not required to instruct the jury in the specific language requested, if the court's instructions fairly and adequately informed the jury of the law. *Maurer v. Wagner,* 509 N.W.2d 258 (N.D. 1993). On appeal, we review jury instructions as a whole to determine if they fairly

---

1. The court instructed the jury about proximate cause:

 *PROXIMATE CAUSE*

 A proximate cause is a cause which, in natural and continuous sequence, produces the injury and without which the injury would not have occurred. It is a cause which had a substantial part in bringing about the injury either

immediately or through happenings which follow one another.

There may be more than one proximate cause of the injury. The fault of two or more persons may contribute to cause the injury, and in such case, each person's fault is regarded as a proximate cause.

and adequately advised the jury of the law. *Id.*

Kunnanzes assert that the trial court erred in denying their requested instruction on the original tortfeasor doctrine:

### SUBSEQUENT NEGLIGENCE

If Defendant Edge's negligence caused the Plaintiff to be treated by a physician wisely chosen by the Plaintiff and if that second physician was negligent in his treatment, Defendant Edge is liable for the effects of any negligence of the second physician.

If Defendant Edge was negligent, Mr. Kunnanz is entitled to recover for the full extent of his injuries, even if some of those injuries resulted from subsequent medical care, and even if you find that the subsequent medical care met accepted standards.

During oral argument to this court, Kunnanzes conceded that the first paragraph of that instruction was not necessary, but asserted that the court erred in not instructing the jury with the second paragraph. The second paragraph of Kunnanzes' request is a damage instruction. Here, the trial court instructed the jury on ordinary negligence and proximate cause, as well as a definition of the measure of damages in an amount to compensate for all detriment proximately caused by the negligent conduct, whether it could have been anticipated or not. The court's instructions adequately advised the jury on damages, and Kunnanzes were not entitled to an instruction in the specific language requested by them.

For reasons stated in this opinion, the judgment is reversed and the case is remanded for a new trial consistent with this opinion.

VANDE WALLE, C.J., and NEUMANN, J., concur.

LEVINE, Justice, concurring in the result.

Although I agree with the majority that the posturing of this case resulted in an unfair advantage to Dr. Edge, I do not believe that the trial court's failure to allow the Kunnanzes to introduce evidence of the outcome in the Minnesota lawsuit is error, or that, on retrial, the trial court should admit evidence of the outcome of the Minnesota lawsuit. The Kunnanzes do not argue that the outcome of the Minnesota case should be offered as evidence of Dr. Edge's negligence; rather, they argue only that the exclusion of the result in the Minnesota lawsuit allowed the jury to believe that the Kunnanzes were seeking double recovery. It seems to me that the issue of the jury's speculation about double recovery best is addressed by an additional jury instruction to the effect that the jury should not concern itself with the possibility of double recovery. To allow into evidence the outcome of the Minnesota case, even for only the limited purpose of damages, quite possibly would posture the case unfairly in the other direction, against Dr. Edge, by placing before the jury evidence that Dr. Hulbert was not negligent.

Therefore, I would hold that the trial court's refusal to give a jury instruction regarding the possibility of double recovery was reversible error.

I, therefore, concur in the result.

SANDSTROM, Justice, concurring in part and dissenting in part.

I concur in parts 2 and 3 of the majority opinion, and dissent from part 1.

Prior inconsistent pleadings from one proceeding are generally admissible as an admission in another. *Enquip, Inc. v. Smith–McDonald Corp.,* 655 F.2d 115, 118 (7th Cir. 1981); *Mason v. Texaco, Inc.,* 129 F.R.D. 542, 543–44 (D.Kan.1989); *Dreier v. Upjohn Co.,* 492 A.2d 164, 167 (Conn.1985). On appeal, the appellants do not dispute that the Minnesota pleadings were admissible.

While the pleadings are admissible, they are not conclusive and the party who made the admission may offer evidence to explain the admission. *Enquip, Inc.* at 118; *Mason* at 546; *Dreier* at 168; *see Malarchick v. Pierce,* 264 N.W.2d 478, 481 (N.D.1978). Explanation may consist of the various legal and subjective motivations underlying the admitting party's decision to file the prior pleadings. *Mason* at 546. The fact that state-

ments in a prior pleading may have been made before discovery, at a time when the admitting party was uncertain as to the truth is a circumstance that may be explained. *Dreier* at 168. The circumstances under which the admissions were made go to the weight to be accorded the statements rather than their admissibility. *Dreier*.

The Minnesota judgment does not explain the Kunnanzes' Minnesota pleadings. The judgment does not explain why the Kunnanzes believed the injury occurred in Minnesota, or why they believed the Minnesota health care providers caused the injury. The judgment does not explain the various legal and subjective motivations underlying the Minnesota lawsuit.

The Kunnanzes assert the trial court erred in excluding the judgment because "[t]he jury verdict in the Minnesota case was relevant to the issue of whether the injury occurred in Minnesota or in North Dakota...." The Minnesota judgment, however, is not admissible to prove the truth of the result of the Minnesota litigation—that the Minnesota health care providers were not negligent. *See Bohn v. Johnson*, 371 N.W.2d 781, 785 (N.D.1985). In *Bohn*, this Court concluded:

"A party to litigation is generally not bound by a judgment in a previous action to which he was not a party and the judgment and evidence introduced in the previous action have no evidentiary value against him. *See Emmil v. Smith*, 62 N.D. 174, 242 N.W. 407 (1932); *Carlson v. Davis*, 45 N.D. 540, 178 N.W. 445 (1920); *Union National Bank v. Western Building Co.*, 44 N.D. 336, 175 N.W. 628 (1919); *Tierney v. Phoenix Ins. Co.*, 4 N.D. 565, 62 N.W. 642 (1895)."

The Kunnanzes claim the judgment should have been admitted to eliminate possible jury speculation that the Kunnanzes were seeking double recovery for their injuries. The trial court, however, specifically instructed the jury not to consider the Minnesota litigation in deciding this case:

"*OTHER LITIGATION*

"Evidence has been introduced in this case of previous litigation between the Plaintiffs Ernest and Alouise Kunnanz against John C. Hulbert, David Hunter, and the Regents of the University of Minnesota. This litigation was brought in the District Court in Hennepin County, Minnesota.

"You are instructed and admonished to give no consideration or speculation as to the outcome or disposition of this litigation."

The trial court correctly instructed the jury, and the jury is presumed to have followed the instructions provided by the court. *State v. Marks*, 452 N.W.2d 298, 302 (N.D. 1990); *State v. Lange*, 497 N.W.2d 83, 87 (N.D.1993). Because of the introduction of the prior pleadings, the trial court had to be careful not to allow evidence of the Minnesota case to unfairly prejudice either the Kunnanzes or Dr. Edge. The trial court had three choices. First, the court could have refrained from instructing the jury in any form of the prior judgment. This choice would have allowed the jury to speculate as to the outcome of the Minnesota litigation and the possibility of double recovery. This choice would have unfairly prejudiced the Kunnanzes. Second, the court could have admitted the Minnesota verdict, or informed the jury that the Kunnanzes were not seeking double recovery. This choice would have allowed the jury to speculate that because the jury in Minnesota found no negligence, Dr. Edge must have caused the injury, or that because the Kunnanzes had not recovered from the Minnesota defendants, the Kunnanzes should recover from Dr. Edge. This choice would have prejudiced Dr. Edge. Finally, the court could have done what it did, which was to pick a neutral middle position. By admonishing the jury not to consider the Minnesota case, without intimating as to the outcome, the court protected both the Kunnanzes and Dr. Edge from possible unfair prejudice.

The majority concludes the Minnesota judgment should have been received into evidence to explain the Kunnanzes' prior pleadings in the Minnesota case. The majority, however, fails to elucidate how the judgment helps explain the prior inconsistent plead-

ings, or how its exclusion unfairly prejudiced the Kunnanzes' case. None of the cases cited by the majority hold that a judgment "explains" the original pleadings.

The prior judgment is not evidence as to the ultimate issue of which, if either, doctor was negligent, and therefore, is not relevant to explain the factual inconsistencies between the Kunnanzes' allegations in the two lawsuits. Its only relevance is to protect against possible jury speculation as to a double recovery. If the Minnesota judgment is included to protect against jury speculation or even to "explain" the prior pleadings, Dr. Edge's defense will be unfairly prejudiced. Dr. Edge's defense is premised on the fact that Ernest Kunnanz's injury occurred at the University of Minnesota Hospital. By allowing the jury to learn that a Minnesota jury concluded the injury did not occur in Minnesota, the effectiveness of Dr. Edge's defense will be greatly diminished. In *Bohn*, this Court explained:

> " 'In general, a judgment in another cause finding a fact now in issue is not admissible. The fact that another jury had theretofore, in another case, determined the very questions at issue in the present trial would have had a strong tendency to induce the jury in the subsequent case to reach the same conclusion, and would therefore have been very prejudicial.' "

*Bohn* at 787, (quoting *Allen v. Great Liberty Life Ins. Co.*, 522 S.W.2d 247, 250–51 (Tex. Civ.App.1975)).

The majority tacitly recognizes the potential for prejudice in its holding. The majority concludes: "On retrial, the trial court is free to consider excluding the Minnesota pleadings, if otherwise practical, in lieu of extending the trial by their use and explanations." The majority gives Dr. Edge a choice: introduce the prior pleadings, which are admissible and relevant, and suffer the consequences of introduction of the prior judgment, which is not relevant and highly prejudicial; or, refrain from introducing the prior pleadings.

The jury was properly informed not to consider or speculate as to the outcome of the Minnesota litigation, thus protecting against any prejudice to the Kunnanzes due to jury speculation as to the possibility of double recovery. The verdict, therefore, should be affirmed.